## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**STEPHEN OLLAR**
3600 Connecticut Ave., N.W., Apt. 307
Washington, DC 20008
(907) 382-7675

    and

**MIRIAM BERMAN**
3600 Connecticut Ave., N.W., Apt. 307
Washington, DC 20008
(703) 282-8384

    Plaintiffs,

    v.

**THE DISTRICT OF COLUMBIA**
    **SERVE:**
    Karl Racine
    Office of the Attorney General
    441 4th Street, N.W.
    Suite 630 South
    Washington, DC 20001
    **SERVE:**
    Mayor Muriel Bowser
    1350 Pennsylvania Ave., N.W.
    Washington, DC 20004

**CHANELLE REDDRICK**
2951 Victory Lane, Apt. 205
Suitland, MD 20746

**BROOKE BEANDER**
4801 Manheim Avenue, Apt. 205
Beltsville, MD 20705

**LYNSEY NIX**
3460 14th Street, N.W., Apt. 1
Washington, DC 20010

    and

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Case: 1:19−cv−01847
Assigned To : Jackson, Ketanji Brown
Assign. Date : 6/24/2019
Description: PERSONAL INJURY (B−DECK)

: Case No.

RECEIVED

JUN 2 4 2019

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

**NORRELL ATKINSON**     :
2323 Race Street, Unit 205    :
Philadelphia, PA 19103     :
              :
    Defendants.    :
_____:

## COMPLAINT

COME NOW Plaintiffs Stephen Ollar and Miriam Berman and respectfully represent as follows:

1.  Plaintiffs seek relief pursuant to 42 U.S.C. § 1983 and common law state tort claims, including, but not limited to, compensatory damages, litigation expenses, and reasonable attorney's fees, based on Defendants' unlawful, malicious, and willful physical abuse, seizure, and detention of Plaintiffs' six-week-old minor child, D.O., and Defendants' subsequent conspiracy to conceal the unlawful conduct by, *inter alia*, (i) making knowingly false representations and critical omissions before a court of law, (ii) offering knowingly perjured testimony in a proceeding before a court of law, (iii) destroying, withholding, and redacting evidence in violation of the court's rules of discovery and multiple subpoenas, (iv) initiating a child abuse and neglect proceeding in the absence of probable cause, and (v) engaging in conduct that violated Plaintiffs' constitutional rights.

## JURISDICTION

2.  The jurisdiction of this Court is properly invoked under 28 U.S.C. § 1331, as the actions complained of herein arise under the Constitution and the laws of the United States. The Court has supplemental jurisdiction over all remaining state law claims under 28 U.S.C. § 1367, as those claims form part of the same case or controversy. The actions complained of herein occurred in the District of Columbia.

## PARTIES

3.      Plaintiff Stephen Ollar is, and at all times relevant to this action has been, a citizen of the United States of America and a resident of the District of Columbia.

4.      Plaintiff Miriam Berman is, and at all times relevant to this action has been, a citizen of the United States of America and a resident of the District of Columbia.

5.      Defendant District of Columbia (hereinafter "D.C. Government") is the local government entity given responsibility for certain municipal activities in Washington, D.C., as set forth in the District of Columbia Home Rule Act passed by Congress in 1973.  Defendant D.C. Government may be properly served by having this Complaint, along with a summons and the initial scheduling order, delivered to (a) Mayor Muriel Bowser, 1350 Pennsylvania Avenue, N.W., Suite 419, Washington, DC  20004, and (b) Karl A. Racine, the Attorney General of the District of Columbia, 441 4th Street, N.W., Room 600 South, Washington, DC 20001.

6.      At all relevant times herein, Defendant Chanelle Reddrick was an actual and/or apparent agent, servant, and/or employee of Defendant D.C. Government, acting at all times (except on occasions as specifically set forth herein) within the course and scope of her employment and/or authority as a child protection social worker with the D.C. Government's Child and Family Services Agency, under color of state law, and pursuant to her official capacity.  Defendant Chanelle Reddrick is named in this lawsuit individually, as well as in her official capacity for acts conducted within the scope of her employment under color of state law, as described more fully below.

7.      At all relevant times herein, Defendant Brooke Beander was an actual and/or apparent agent, servant, and/or employee of Defendant D.C. Government, acting at all times

3

(except on occasions as specifically set forth herein) within the course and scope of her employment and/or authority as a child protection supervisor with the D.C. Government's Child and Family Services Agency, under color of state law, and pursuant to her official capacity. Defendant Brooke Beander is named in this lawsuit individually, as well as in her official capacity for acts conducted within the scope of her employment under color of state law, as described more fully below.

8.     At all relevant times herein, Defendant Lynsey Nix was an actual and/or apparent agent, servant, and/or employee of Defendant D.C. Government, acting at all times (except on occasions as specifically set forth herein) within the course and scope of her employment and/or authority as an Assistant Attorney General in the D.C. Government's Office of the Attorney General, under color of state law, and pursuant to her official capacity. Defendant Lynsey Nix is named in this lawsuit individually, as well as in her official capacity for acts conducted within the scope of her employment under color of state law, as described more fully below. All of her activities alleged herein involve investigative and administrative activities prior to any judicial proceeding, and absolute immunity is thus inapplicable here.

9.     At all relevant times herein, Defendant Norrell Atkinson was an actual and/or apparent agent, servant, employee, and/or state actor of Defendant D.C. Government, acting at all times (except on occasions as specifically set forth herein) within the course and scope of her authority as state actor, investigator, and/or willful joint participant with the D.C. Government's Child and Family Services Agency and Office of the Attorney General, under color of state law. Defendant Norrell Atkinson is named in this lawsuit individually, as well as in her official capacity for acts conducted within the scope of her employment under color of state law, as described more fully below.

## STATEMENT OF FACTS

10.     This Complaint alleges herein official malfeasance, recklessness, and malicious acts by the D.C. Government, its agencies, servants, individual employees, and state actors, arising from a series of events in which Plaintiffs' efforts to protect their daughter from the abuses of medical providers, whom D.C. Government and its agents directed to perform medically unnecessary, painful, and unlawful tests, were met with retaliation by Defendants. Defendants' did so to evade the consequences of their illegal conduct.  Defendants entered into an agreement to seize Plaintiffs' six-week-old breastfeeding daughter, to fabricate the justifications for said removal, to force Plaintiffs to defend against a baseless child neglect allegation, to destroy and withhold documents that evidenced their misconduct, and to make Plaintiffs stipulate to having neglected their daughter and thereby foreclosing any future redress.

11.     Plaintiffs Stephen Ollar and Miriam Berman's nightmare began on June 29, 2016, when their six-week-old baby was taken away without just cause based on the false claim that their daughter's injuries from an accidental fall were "not medically possible" by the explanation that was provided.   From June 25, 2016, through the present, the various Defendants engaged in a continuing course of misconduct, in which they performed an investigation and neglect proceeding in a grossly negligent, abusive, intentionally wrongful, and retaliatory manner, despite the fact no evidence ever existed of any abuse or neglect.  As a result of Defendants' mishandling of its investigation and neglect proceeding, false statements, and animus, Plaintiffs were forced to incur substantial economic losses, as well as severe and irreparable emotional harm and special injuries, for which they deserve to be compensated.

12.     On the early morning of June 25, 2016, Plaintiff Stephen Ollar was walking six-week-old D.O. around their apartment to help her fall asleep.  He was carrying her with her head on his shoulder and her body resting on his chest and arm.  D.O. shifted her weight backwards and fell out of his arms onto the back of her head on a hardwood floor covered with a thin rug.  D.O. was consolable and appeared uninjured.  She nursed, had a bowel movement, and then fell asleep while breastfeeding.

13.     D.O. awoke roughly four hours later and had difficulty nursing.  She had also developed a small bump at the back of her head.  Plaintiffs decided out of an abundance of caution to take D.O. to Sibley Memorial Hospital (hereinafter "Sibley") for an evaluation.  Dr. Woo Kim was the emergency room physician who performed a complete physical examination on D.O.  He specifically looked for, and did not detect, any abnormality in her appearance or behavior, to include any indication of bruising, swelling, bleeding, or pain anywhere on D.O.'s person, with the exception of the already detected bump at the back of her head.  Based on his examination and D.O.'s consolable state, Dr. Kim discussed with Plaintiffs the dangers of radiation exposure to infants, and it was mutually agreed that a CT examination was unwarranted.

14.     After an observational period in which D.O. still refused to breastfeed, Dr. Kim and the parents again discussed the dangers of performing a CT and agreed that the benefits outweighed the risks of radiation exposure.  Dr. Kim ended his shift before the CT was performed, and Dr. Don Coleman purportedly assumed D.O.'s care.  The CT revealed that D.O. had sustained two symmetric biparietal skull fractures from the accidental fall.  The parietal bones are the thinnest bones in an infant's skull, and the CT also revealed that D.O.'s parietal bones were severely under-mineralized and especially thin.  Dr. Coleman never discussed the

results of the CT examination with Plaintiffs, and opted instead to transfer D.O. to Children's National Medical Center (hereinafter "CNMC") without consulting Plaintiffs.

15.     Around the same time, Nurse Rachael Ringers made a Child and Family Services Agency ("hereinafter CFSA") hotline call.  Nurse Ringers informed CFSA that a child had presented with skull fractures and of her subjective suspicion that Plaintiffs' explanation was insufficient.  She offered no additional information nor did she indicate that any other provider, namely Dr. Kim or Dr. Coleman, shared her concerns.  CFSA opened an investigation.  The CFSA investigator assigned to this matter, Defendant Chanelle Reddrick, never contacted Drs. Kim or Coleman during the course of her investigation to learn whether D.O.'s treating physicians at Sibley shared Nurse Ringers' concerns.

16.     At or about 12:00 p.m., D.O was transferred by ambulance to CNMC.  From the outset, CNMC's staff treated Plaintiffs suspiciously and denied Plaintiffs their right to necessary information about the purpose for the medical tests that they would proceed to order.

17.     Dr. Xian Zhao, a medical fellow, performed a physical examination on D.O. in the emergency room.  His examination, like Dr. Kim's previously, did not detect any abnormality in her appearance or behavior, to include any indication of bruising, swelling, bleeding, or pain anywhere on D.O.'s person, with the exception of the already detected bump at the back of her head.

18.     While Plaintiffs and their daughter were waiting in the emergency room, Defendant Reddrick and Metropolitan Police Department (hereinafter "MPD") Detective Anne Micciche arrived at CNMC and interviewed Dr. Zhao.  Dr. Zhao informed the investigators that D.O.'s fractures "can be ruled as normal."

19.     Despite his examination indicating an absence of additional injuries, Dr. Zhao ordered a medically unnecessary skeletal x-ray survey of D.O. to look for "healing and occult fractures," i.e. old injuries.   Dr. Zhao misled Plaintiffs as to the purpose of the skeletal survey, informing them that the survey was to ensure that D.O. had not suffered any additional injuries from the accidental fall.   Dr. Zhao did not discuss with Plaintiffs alarming number of harmful x-rays that would be taken or the radiation risks.   Upon information and belief, D.C. Government instructed Dr. Zhao to have a survey performed.

20.     The skeletal survey was an emotionally distressing experience for the family. D.O. was screaming, fighting, and uncooperative throughout the entire procedure.   The x-ray technician forcefully pulled on D.O.'s arms and legs while she vigorously tried to pull them in. Eventually, he taped D.O.'s hands to the table and held her body down with blankets, while she screamed and fought to be unrestrained. D.O. was visibly in pain during the entire process. D.O. was exposed to roughly twenty doses of unnecessary radiation during the survey.

21.     This painful and medically unnecessary skeletal survey only proved that D.O. did not suffer from any old or new injuries.

22.     Plaintiffs and their daughter returned to CNMC's emergency room and were kept waiting for several hours.   They were eventually informed that CNMC would like to keep their daughter for observation, and D.O. was transferred to CNMC's Pediatric Intensive Care Unit (hereinafter "PICU").

23.     Immediately upon their arrival at the PICU, Defendant Reddrick and Detective Micciche surprised Plaintiffs and asked to interview each Plaintiff separately.   Plaintiffs were previously unaware of any concerns regarding the etiology of D.O.'s injuries.   Plaintiffs cooperated with the interviews, consented to have the interviews audio recorded, gave entirely

consistent accounts of the preceding events, agreed to permit the investigators to perform a home visit, and provided a reenactment of the accidental fall.   Defendant Reddrick and Detective Micciche then left CNMC.   Shortly thereafter, Detective Micciche telephoned Plaintiff Stephen Ollar to request additional information, which he freely provided to the Detective.   Defendant Reddrick and Detective Micciche never contacted either Plaintiff again.

24.     While D.O. was in the PICU, CNMC staff did not allow Plaintiff Berman to breastfeed her daughter.   The ostensible justification for depriving D.O. of nutrition was that, if additional testing had to be performed under sedation, D.O. could not have consumed any food for risk of aspirating.   Plaintiffs were uncomfortable depriving their daughter of nutrition but deferred to the orders of the medical providers.

25.     Later that evening, D.O. underwent a second CT scan of her head.   There was no change in D.O.'s condition warranting the scan.   Plaintiffs were not consulted on its necessity. They were told it was necessary to ensure her condition had not worsened.   The second CT scan revealed no changes from the first scan.   Upon information and belief, the purpose of the second CT scan was to gather additional evidence for D.C. Government's ongoing investigation.   As a result, D.O. was exposed to an inordinate amount of additional unnecessary radiation.

26.     On Sunday, June 26, 2016, D.O.'s treating physicians ordered an MRI of D.O.'s brain.   Plaintiffs were again not allowed to feed D.O. because the MRI required sedation. However, D.O. was ultimately unable to have the MRI performed due to purported mechanical issues.   The MRI was rescheduled for the following day, and D.O. was thus kept 48 hours without nutrition.

27.     Also, on June 26th, Defendant Reddrick had made a "referral" to CNMC's Child and Adolescent Protection Center ("CAPC") to have one of its child abuse pediatricians assist in D.C. Government's investigation.  D.C. Government utilizes CAPC's "medical information and medical findings to assist in CFSA's . . . determination and investigation."  At the purposeful direction of D.C. Government and Defendant Reddrick, Defendant Norrell Atkinson, a child abuse pediatrician with CAPC, would order medically unnecessary and painful testing to be performed on D.O.

28.     On Monday, June 27, 2016, Defendant Atkinson arrived at D.O.'s hospital room.  Defendant Atkinson did not inform Plaintiffs she was performing an investigation on behalf of D.C. Government.  Plaintiffs believed Defendant Atkinson was one of D.O.'s treating physicians.  Defendant Atkinson asked Plaintiffs questions regarding D.O.'s injuries, her presentment at the hospital, her medical history, and the Plaintiffs' medical histories and family histories.  Defendant Atkinson also requested to perform a physical examination of D.O.  Plaintiffs answered Defendant Atkinson's questions and allowed her to perform the examination.

29.     Shortly after Defendant Atkinson departed, the PICU nurses arrived to perform a battery of blood tests on D.O.  These tests were extremely painful.  A large amount of blood cannot be drawn from a six-week-old infant's veins due to the veins' delicate nature and small size.  The nurses lacerated D.O.'s foot and squeezed her blood out drop-by-drop for an hour until a sufficient quantity was obtained to fill all of the test tubes.  D.O. screamed and struggled throughout the procedure, and Plaintiffs were forced to watch this emotionally distressing abuse being inflected on their daughter.  The tests, however, were not medically necessary, but rather Defendant Atkinson ordered the tests to further D.C. Government's investigation.

30.     Following the blood tests, D.O. underwent the MRI of her brain.   Again, unbeknownst to Plaintiffs, Defendant Atkinson had ordered the MRI expanded to include D.O.'s neck and spine.   Plaintiffs were not consulted, informed of the additional risks, and did not give their consent.   Moreover, D.O. never demonstrated, and no medical provider ever detected, any symptomology with her neck or spine.   Defendant Atkinson expanded the MRI to include the neck and spine to look for non-existent evidence of shaken baby syndrome, a thoroughly debunked medical condition.   Notably, an ophthalmologist had examined D.O.'s eyes on June 26 and detected no evidence of retinal hemorrhaging.   Retinal hemorrhages were considered one of the primary indicators of shaken baby syndrome and traumatic head abuse. Defendant Atkinson was aware of the absence of retinal hemorrhaging, but nevertheless, ordered the medically unnecessary MRI of D.O.'s neck and spine.

31.     Because the MRI was expanded, it now required a considerably more time to perform.   D.O. was administered an even greater amount of dangerous anesthetic that lowered her heart rate and rendered her unconscious.   Ultimately, the anesthetist deemed it too dangerous to keep this six-week-old infant unconscious.   She terminated the MRI after only the brain and neck had been imaged.   Defendant Atkinson was not satisfied with the outcome and ordered an additional MRI to be performed the following day of the spine alone.

32.     While all of this transpired, Plaintiffs were continually misled by CNMC and its staff as to the purpose for the medically unnecessary blood tests and expanded MRI, and as to whom at CNMC had ordered these tests.   In regards to the MRI, Plaintiffs were informed that the additional MRI of D.O.'s spine was necessary to ensure that D.O. did not sustain an injury to her neck, which had already been imaged, that would make feeding problematic.   D.O. was thus kept for an additional 24 hours without nutrition, in addition to the previous 48 hours.

Plaintiffs were forced to watch their six-week-old daughter cry out in agony all night for food, having been deprived for nearly 72 hours without nutrition.  The second MRI was canceled the following day due to purported scheduling issues.  Unable to continue the deception and due to Plaintiffs' continued insistence to feed their daughter, the PICU staff informed Plaintiffs that there was now miraculously no longer a concern with D.O.'s neck and she could be fed.  D.O.'s medical records actually indicate that a pediatric nutritionist gave explicit instruction that under no circumstances could D.O. be deprived of nutrition for longer than 72 hours.

33.    On the evening of June 27th, Plaintiffs were accidentally informed by the nighttime staff that the previous blood tests were done to further an "investigation."  When Plaintiffs confronted D.O.'s treating physician with this information the following morning, Plaintiffs were misled as to who had ordered the blood tests.  Roughly an hour later, Defendant Atkinson disclosed to Plaintiffs that she had ordered the medically unnecessary blood tests. Plaintiffs informed Defendant Atkinson that her actions constituted a battery on D.O. and that they wanted "communication" before any further tests were performed on their daughter.

34.    Defendant Atkinson immediately contacted Defendant Reddrick.  Defendant Atkinson informed Defendant Reddrick that she had been accused of committing a battery on a six-week old infant.  Defendants Atkinson and Reddrick agreed to remove Plaintiffs from the hospital.

35.    D.C. Government and Defendant Reddrick had direct notice that Defendant Atkinson was accused of committing a battery on a six-week-old infant but failed to open an investigation or take steps to safeguard D.O. from further abuse.

36.    On Wednesday, June 29, 2016, at or about 3:00 p.m., Defendant Reddrick, Detective Micciche, and armed hospital security guards arrived at D.O.'s hospital room.  They

12

placed a medical hold on D.O. and removed D.O. from Plaintiffs' care.  Not only was the removal unconstitutional, but it also violated D.C. Code § 4-1301.09a and CFSA's *Investigation: Procedural Operations Manual*, which required Defendant Reddrick and D.C. Government to make reasonable efforts "prior to the removal of a child . . . in order to prevent or eliminate the need for removing the child."

37.      D.C. Government, Defendant Reddrick, and Defendant Atkinson falsely claimed that Plaintiffs were uncooperative with the investigation, despite their previous recorded full cooperation and transparency.  Defendant Reddrick would testify that the purpose of her June 29 visit, was only to ask Plaintiffs "additional questions that had come up during the last few days of kind of working on the investigation" and that the removal decision was made only after Plaintiffs had purportedly declined to answer her additional questions.  Defendant Reddrick would later attempt to retreat from her previous testimony and claim, "So technically what the conversation [with Defendant Reddrick's supervisors] was, was that if the parents had not agreed to the additional questions that yes, the removal was going to take place."

38.      All of the facts evidence that the removal decision was made prior to any purported refusal to answer Defendant Reddrick's questions.  Defendant Reddrick made no attempt to contact Plaintiffs prior to the removal.  Defendant Reddrick acknowledged that Plaintiffs had already provided answers to all of her list of "additional questions."  Defendant Reddrick had, prior to her arrival, completed the removal paperwork and photocopied it to provide to both Plaintiffs.  Defendant Reddrick first testified that armed security guards were called after Plaintiffs' purported refusal to cooperate, but later recanted this testimony and admitted that the guards were present from the outset.  Finally, D.O.'s medical records evidence that the PICU was alerted to the removal and was "preparing teams for safety" at 9:00

13

a.m., roughly 6 hours before the actual removal occurred. The entire PICU was assembled to observe Plaintiffs' removal in a humiliating spectacle for Plaintiffs to unnecessarily endure.

39.    D.C. Government is constitutionally required to obtain judicial authorization to remove a child when there is opportunity to do so. Defendant Reddrick had ample opportunity to prepare the removal paperwork, to consult with supervisors, to coordinate with MPD and hospital security, and to alert the PICU of the removal six hours prior. Despite all of this time, Defendant Reddrick did not file a removal petition with the Family Court in the middle of a workday.   Moreover, there was no exigent circumstance that would have permitted the removal. Plaintiffs and their daughter had been at the hospital for five days without incident. Plaintiffs had not refused any medical treatment for their daughter, including those procedures that Plaintiffs would later learn were medically unnecessary. Plaintiffs had made no attempt to remove their daughter from the hospital before her scheduled discharge days later. There was no evidence or allegation of any prior abuse, as supported by the first skeletal survey. Lastly, Defendant Reddrick's Investigation Summary does not allege that the removal was justified based on an exigent circumstance, nor has D.C. Government ever alleged an exigent circumstance justified the removal.   Even the allegation that Plaintiffs refused to answer additional questions, if true, would not justify a removal without first seeking judicial approval.

40.    In Plaintiffs' absence, Defendant Atkinson continued to perform abusive, unlawful, and medically unnecessary procedures on D.O. to look for evidence of abuse.  On June 30, 2016, Defendant Atkinson subjected D.O. to a second MRI of her spine.  Without Plaintiffs' consent, CNMC and its staff again deprived D.O. of nutrition.  CNMC's staff placed a needle in D.O.'s arm and administered anesthetic that lowered her heart rate, rendered her unconscious, and exposed her to an inordinate amount of risk of harm and death.  She was kept

in this state while her entire spine was scanned to look for non-existent evidence of shaken baby syndrome.   Defendant Atkinson ordered this procedure knowing that Plaintiffs had demanded communication before any further tests were performed and that Plaintiffs' removal made it physically impossible for them to give consent.   However, Plaintiff Berman's signature was *forged* on the medical authorization for the anesthetic.   No evidence of shaking was found.

41.     On June 30, 2016, D.C. Government assigned Defendant Lynsey Nix, an Assistant Attorney General, to represent it at a probable cause hearing before the Family Court of the D.C. Superior Court.   Defendant Nix was required by statute to investigate the facts of this removal and determine whether probable cause existed before drafting a petition.

42.     Due to the absence of any evidence of abuse or neglect by Plaintiffs, the only remaining legal justification for the removal was the allegation that the etiology of D.O.'s injuries was unknown, otherwise known as the permissive inference of neglect, codified at D.C. Code § 16-2316(c).   The Petition states, "[G]iven the fact that the parents' explanation of the cause of injuries was *not medically possible*, and they refused to provide any additional accidental account, *the cause of [D.O.'s] injuries is unknown*, and non-accidental trauma cannot be ruled out."   Defendant Reddrick swore under oath she read the petition and "the facts contained therein [were] true to the best of [her] knowledge and belief."   Defendant Reddrick later testimony conceded that no medical provider had ever stated that D.O.'s injuries were "not medically possible."

43.     In the absence of evidence, Defendant Nix fabricated support and omitted evidence that contradicted her claims.   For example, the Petition states that Dr. Zhao concluded that Plaintiffs' explanation "did not account for the severity of the injuries."   Defendant Reddrick's notes indicate that Dr. Zhao actually informed her that D.O.'s injuries "can be ruled

as normal."  The Petition also cites Defendant Atkinson's medical note for support, but omits

that the note stated Defendant Atkinson was "unable to fully assess" D.O.'s injuries.  This

language provided essential context and was excluded from any disclosure to the court or

Plaintiffs' counsel.

44.     Additionally, the Petition contained numerous inaccuracies portraying Plaintiffs'

as uncooperative.  For example, the Petition alleged that Plaintiffs asked Defendant Atkinson to

leave a family team meeting on June 29th.  D.C. Government later acknowledged that this

representation was false and amended the representation out of the Petition.

45.     On July 2, 2016, the Family Court held a hearing to determine, as Defendant

Nix stated, "probable cause the allegations in the petition are true."  In support of that

determination, Defendant Nix fabricated medical claims of an uncertain etiology from D.O.'s

treating physicians and from various other imaginary physicians.  Defendant Nix *repeatedly*

declared, "The medical evidence *we have right now* from the [ER] doctor at Sibley, the [ER]

doctor from Children's, Dr. Atkinson from her review of the medical records, from the

neurology doctor, from the ophthalmology doctor said *this is not possible*."  None of these

representations were true:  (1) D.C. Government never spoke to a doctor at Sibley, and D.O.'s

medical records from Sibley, which D.C. Government lacked, do not support this claim; (2) Dr.

Zhao determined that D.O.'s injuries "can be ruled as normal"; (3) Defendant Atkinson was

"unable to fully assess" D.O.'s injuries; (4) D.C. Government never spoke to any neurologist or

ophthalmologist and did not possess their records; and (5) not one of D.O.'s medical records

states that her injuries were "not medically possible."

46.     Defendant Nix called Defendant Brooke Beander to testify in support of the

allegations in the Petition.  Defendant Beander is a CFSA Supervisor who presented herself as

having "assisted [Defendant Reddrick] in supervising the investigation, findings and the determination for the removal." There does not exist a single document or email associating Defendant Beander with the investigation. Defendant Reddrick, who coincidentally went on vacation the day after the removal, was unavailable to testify. Defendant Beander appears to have been the on-call CFSA supervisor for the weekend, who had to testify in Defendant Reddrick's place despite her lack of personal knowledge.

47.     Defendant Nix asked Defendant Beander on direct examination, "And, from your review of any medical records that you have, who expressed concern that the report of the injury . . . *could not have caused* injuries as significant as those [D.O.] suffered?" Defendant Beander falsely testified, "*Every doctor* that she has seen from Sibley Hospital, the Children's ER, to ophthalmology to neurology to CAPC to PICU." The wording between Defendant Nix's statements at the beginning of the hearing and Defendant Beander's testimony at the end is too strikingly inaccurate and identical to be a coincidence. Despite Defendant Nix's intimate knowledge of what the evidence in D.C. Government's possession actually demonstrated, she did not correct Defendant Beander's testimony. Defendant Beander's lack of involvement, and the similarity between her testimony and Defendant Nix's representations, suggests Defendant Nix suborned the perjured testimony from Defendant Beander prior to the hearing.

48.     On redirect, Defendant Nix had a second opportunity to correct Defendant Beander's perjured testimony. Defendant Nix asked, "And, where did you get the information that the consistent statement about the fall is *not possibly the cause of these injuries*?" Defendant Beander again falsely testified, "*From every doctor* from Sibley Hospital to the ER to the CAPC." Defendant Nix was again silent.

49.     Defendant Nix, Defendant Beander, and D.C. Government's repeated false assertions and perjured testimony resulted in the court "reluctantly" finding probable cause. The court recited "*all of the medical experts*, so far, who've been involved in this case . . . *have indicated that the injuries aren't consistent with the explanation of a fall*," and "*the medical community, apparently, from the evidence consistently believes* that something happened other than what's been told."

50.     Having found probable cause, the Court ordered Plaintiffs' child into shelter care with family friends, who lived over an hour away from Plaintiffs.  The Court permitted Plaintiffs to have daily visits with their daughter over the objections of Defendant Nix and D.C. Government.  Plaintiff Miriam Berman in particular would make the hour-long drive each day to bring breast milk to her still breast-feeding child.  The enormity of the pain, suffering, humiliation, inconvenience, emotional trauma, detrimental effect on D.O.'s health, and financial drain on Plaintiffs cannot be understated.  Due solely to the intentionally false representations of Defendants, Plaintiffs would not regain full custody of their child until one year later.  Plaintiffs were forced to defend against the baseless allegations of neglect, incurring enormous legal expenses from retaining counsel and expert witnesses to refute those allegations.

51.     On July 5, 2016, Plaintiffs' counsel sent Defendant Nix an email requesting that D.C. Government reconsider its position on shelter care.  Defendant Nix responded by escalating her previous misrepresentations.  Defendant Nix stated, "I had an opportunity to discuss [D.O.'s] medical condition with some of the medical team at CNMC today. . . .  The medical providers (neurology, radiology, and Dr. Atkinson and her supervisor at CAPC) stated the injuries would not be caused from a fall from the father's chest."  Defendant Nix further

stated that D.O.'s injuries were caused by "shaking."   As has been stated, no medical professional or record has ever stated that D.O.'s injuries "would not be caused" by the accidental fall nor has anyone ever stated that "shaking" caused her injuries.  Moreover, D.C. Government did not call a neurologist or the CAPC supervisor at the subsequent trial.  D.C. Government did call Defendant Atkinson and Dr. Eglal Shalaby-Rana, a CNMC radiologist, to testify, and both refused to corroborate Defendant Nix's claims.  Lastly, the unlawful medical tests that Defendant Atkinson performed on D.O. without Plaintiffs' consent conclusively established there was no evidence of shaking.

52.     On or about July 12, 2016, Plaintiffs and D.O.'s guardians were required to take D.O. to a follow-up appointment with Defendant Atkinson at CNMC.  Defendant Atkinson requested a second x-ray skeletal survey of D.O., representing to Plaintiffs that a second skeletal survey is "standard protocol . . . when a child comes in with injuries."  Defendant Atkinson failed to disclose that a second skeletal survey was solely to look for evidence of abuse.  CNMC has procedures in place to protect children, especially infants, from unnecessary radiation exposure, which were disregarded.

53.     Lacking Plaintiffs' informed consent, D.O. underwent a second skeletal survey. Dr. Dorothy Bulas, a board-certified pediatric radiologist at CNMC with over 30 years of experience, found no evidence that D.O. had any abnormality in her skeletal survey.  She specifically looked for and found no evidence of any acute or healing classic metaphyseal lesion ("CML"), a hypothetical fracture at the end of an infant's long bones where the cartilage purportedly separates from the bone itself.

54.     Defendant Atkinson asked another radiologist, Dr. Shalaby-Rana, to review D.O.'s skeletal survey.  Dr. Shalaby-Rana had no authority to review D.O.'s x-rays.  Dr.

Shalaby-Rana claimed there was an irregularity in D.O.'s upper left arm, which she alone suspected was a CML.  When Dr. Shalaby-Rana presented Dr. Bulas with her suspicions, Dr. Bulas was "not comfortable" amending her original report.  Dr. Shalaby-Rana independently amended Dr. Bulas' report despite her objection.  Dr. Shalaby-Rana and Defendant Atkinson then represented to Plaintiffs that the images of D.O.'s shoulder were "unclear" and that additional images were necessary.  However, Dr. Shalaby-Rana testified the intent was to increase the "juice" (radiation) and get more detailed images.  D.O. was subjected to a third skeletal survey.  Plaintiffs were not informed that their daughter was being subjected to an increased level of radiation exposure.  After the third set of x-rays, Dr. Shalaby-Rana still professed that the injury was uncertain, and wanted a fourth set of x-rays.  At this point, Plaintiffs declined to subject their child to any further radiation exposure.  Despite previously requiring a fourth set of x-rays, Dr. Shalaby-Rana diagnosed a CML without them. Inconceivably, Defendant Atkinson and Dr. Shalaby-Rana proclaimed the existence of a very significant arm fracture where Dr. Kim, Dr. Zhao, Defendant Atkinson herself, and countless doctors and nurses never detected any pain, discomfort, loss of motion, bruising, swelling, or other symptomology in D.O.'s left arm.

55.     D.C. Government was obligated to protect D.O., a ward of the state, from the continued abuses of Defendant Atkinson and the long-term detrimental effects of medically unnecessary radiation.  Rather, Defendant Atkinson's acted at the purposeful direction of D.C. Government.

56.     Following the probable cause hearing, D.C. Government assigned the ongoing neglect proceeding to AAG Aisha Lewis.  AAG Charmetra Parker, AAG Lewis and Defendant Nix's supervisor, also became actively involved in the neglect proceeding.

57.     On September 23, 2016, Plaintiffs filed a Motion to Dismiss the Petition in the neglect proceeding.   Plaintiffs obtained a copy of Defendant Atkinson's medical notes. Plaintiffs learned that D.C. Government and Defendant Nix had omitted critical information regarding Defendant Atkinson's inconclusive findings regarding D.O.'s injuries.   Plaintiffs argued that the Petition was incomplete, inaccurate, and misleading, and that D.C. Government deliberately, or with reckless disregard for the truth, omitted critical information from the Petition that would have likely resulted in a finding of no probable cause.   When the motion was filed, Plaintiffs had yet to discover the omissions of Dr. Zhao's statements or that no medical professional ever stated, or would state, that D.O's injuries were "not medically possible."   AAGs Lewis and Parker's response indicated they knew or should have known of the previous misrepresentations; yet, they merely claimed that "[t]here was no misconduct on behalf of the [OAG]."   The Court deferred to D.C. Government.

58.     D.C. Government, AAG Lewis, and AAG Parker possessed a duty to investigate the allegations of misconduct and should have taken reasonable remedial actions to avoid or mitigate the consequences of the misconduct.

59.     On July 26, 2016, Plaintiffs served discovery on D.C. Government, requesting all non-privileged documents and communications relating to the investigation, removal, and neglect proceeding.   D.C. Government's document production on August 26, 2016, lacked any communications, handwritten notes, or a required privilege log.   Notably, Plaintiffs deposed Defendant Reddrick the day before on August 25, 2016, in AAG Lewis's presence.   Defendant Reddrick testified that she had sent emails to Defendant Atkinson and the staff at CNMC and that she had reviewed her handwritten notes prior to the deposition.   Despite this notice, D.C. Government failed to produce these discoverable items.

60.     Plaintiffs' counsel made several requests to AAGs Lewis and Parker for these items and even issued a subpoena on October 6, 2016.  AAGs Lewis and Parker ignored these overtures.  Plaintiffs' counsel raised the issue with the Family Court.  The Court ordered D.C. Government to "[j]ust produce them."  In response, AAGs Lewis and Parker produced a limited selection of Defendant Reddrick's received emails.  AAGs Lewis and Parker did not produce the emails Defendant Reddrick had sent, the email communications from any other employee at CFSA, Defendant Reddrick's handwritten notes, or a privileged log.

61.     Many of the emails produced contained poorly concealed redactions to make it appear that there were no additional emails in the email chain.  In one instance, Defendant Reddrick is admonished by her supervisor, Elizabeth Muffoletto, for an email that Defendant Reddrick sent to numerous individuals about finding a substitute to testify in Defendant Reddrick's place at the probable cause hearing.  The email suggested that Defendant Reddrick's "time off" had influenced the removal decision.  Ms. Muffoletto warned Defendant Reddrick, "We have to be careful regarding our messaging and what others may perceive from it via email communications."  AAGs Lewis and Parker redacted Defendant Reddrick's sent email that prompted this reprimand, despite its clear responsiveness.

62.     Plaintiffs and their counsel continually fought to obtain these documents throughout the neglect proceeding and after the proceeding.  AAG Lewis would represent to Plaintiffs' counsel and the Family Court that she did "not have any further responsive information" and that she "included everything that [she] felt was responsive to the request," only to be repeatedly repudiated for failing to produce responsive documents and communications.

63.     In regard to Defendant Reddrick's handwritten notes, Defendant Reddrick testified at trial that she had reviewed her handwritten notes in preparation for her testimony that day.   Immediately thereafter, Plaintiffs' counsel once more requested production of those notes.   Having received no response from AAG Lewis for over a week, Plaintiffs' counsel wrote AAG Parker.   AAG Lewis finally responded and disclosed that Defendant Reddrick "shred[ed] these notes."   The Family Court ordered Defendant Reddrick to explain the destruction.   Defendant Reddrick acknowledged having testified twice to having reviewed her handwritten notes, but then testified that she simply "misspoke."   Defendant Reddrick added that her notes were not included in her case file, but rather she preserved them in an undisclosed location before shredding.   D.C. Government has never accounted for why investigation records were kept separate from CFSA's investigation file on D.O. or why these handwritten notes were not produced in response to Plaintiffs' original discovery requests. Upon information and belief, the handwritten notes contained evidence contradicting D.C. Government's allegations in the Petition and its representations at the probable cause hearing.

64.     AAGs Lewis and Parker also tampered with witnesses.   During discovery, Plaintiffs noticed the deposition of CNMC radiologist, Dr. Gilbert Vezina.   AAGs Lewis and Parker in conjunction with D.O.'s guardian *ad litem*, Lauren Schwartz, "prepared" Dr. Vezina for the deposition and provided him with Plaintiffs' expert disclosure reports.   These actions were not disclosed, leading Plaintiffs to misbelieve they had obtained an impartial deposition from the doctor.

65.     AAGs Lewis and Parker made several attempts to obtain a stipulation of neglect in order for Plaintiffs to regain custody of their daughter.   AAGs Lewis and Parker even offered

an *Alford* plea type stipulation, wherein Plaintiffs stipulate to neglect but do not admit to having neglected their child.  Plaintiffs refused to accept D.C. Government's coercive offers.

66.     On October 4, 2016, the neglect proceeding began before the Family Court. D.C. Government called six physicians to testify as experts, including Defendant Atkinson. Not one of these experts opined to a reasonable degree of professional certainty that D.O.'s injuries were not satisfactorily explained by the accidental fall.  Defendant Atkinson, Dr. Shalaby-Rana, and Dr. Zhao all acknowledged that D.O.'s injuries could have resulted from a fall as described.  Dr. Zhao also testified that he had informed Defendant Reddrick that D.O.'s injuries "can be ruled as normal."  Despite exaggerating the severity of D.O.'s injuries, Drs. Kim and Vezina testified that her injuries were only "mild" and "mild to moderate."  D.C. Government's experts also failed to identify a single academic article supporting that the etiology of D.O.'s injuries was unexplained.  D.C. Government did not call an ophthalmologist or neurologist to substantiate the false assertions at the probable cause hearing.  Lastly, D.C. Government's case benefited from the absence of the evidence it withheld and destroyed.

67.     Conversely, Plaintiffs called two biomechanical engineers, a pediatric neurosurgeon, and two pediatric radiologists, all of whom testified to a reasonable degree of scientific and medical certainty that D.O.'s injuries were consistent with and entirely explained by the accidental fall and that there was no CML to her upper left arm.  These experts supported their testimony with nearly a dozen academic articles, to include cadaver studies of infant falls that paralleled the exact injuries D.O. sustained.

68.     At the conclusion of the evidence, both sides submitted proposed findings of fact and conclusions of law.  D.C. Government's submission falsely claimed that Defendant Atkinson had testified that D.O.'s injuries were unexplained.  The magistrate judge adopted

D.C. Government's submission nearly verbatim and found against Plaintiffs. Plaintiffs submit that this finding was erroneous as it was based on Defendants' false representations and lacked the evidence Defendants withheld and destroyed. The Family Court's finding is currently on appeal.

69.     While drafting their appeal, Plaintiffs reread the probable cause hearing transcript and discovered the full extent of Defendants' previous misrepresentations. In order to eliminate alternative explanations, Plaintiffs filed two Freedom of Information Act ("FOIA") requests with CFSA and OAG to obtain the missing documents and communications. CFSA disregarded Plaintiffs request. OAG produced some additional responsive communications but, a week later, informed Plaintiffs it was refusing to produce any additional documents or communications.

70.     Plaintiffs also moved the Family Court for a Motion to Compel Production on April 12, 2017. The Court granted Plaintiffs' motion and ordered production. D.C. Government and AAG Parker refused. Plaintiffs filed multiple show cause motions and oppositions to AAG Parker's efforts to avoid production. The Court repeatedly denied AAG Parker's motions and took the unusual step of reopening the neglect proceeding to resolve the missing discovery. AAG Parker acknowledged production was incomplete but steadfastly refused to produce these items. Plaintiffs never received the missing discovery.

71.     After nine-months of extensive research, Plaintiffs filed their brief with the District of Columbia Court of Appeals, in which they detailed the Defendant's misconduct. Plaintiffs argued, *inter alia*, that Defendants misrepresentations at the probable cause hearing deprived D.C. Government of standing, the Family Court of jurisdiction, and violated Plaintiffs' constitutional rights.

72.     D.C. Government assigned AAGs Rhondalyn Okoroma and David Stark of the Office of the Solicitor General to the appeal.  Despite having an ethical duty to represent D.O.'s best interests, D.C. Government's opposition brief nowhere denies, refutes, or attempts to explain the allegations of misconduct.  D.C. Government deliberately avoided addressing the misconduct of its agents, servants, employees, and state actors.  For the purposes of Plaintiffs' appeal, D.C. Government's failure to deny the allegations of misconduct is a concession of said misconduct.

73.     The highest levels of D.C. Government and the D.C. Office of Attorney General have been placed on notice of the misconduct by its agents, servants, employees, and state actors and have not investigated or remedied said misconduct.  In addition to AAGs Lewis and Parker, who are currently both section Chiefs in OAG's Family Services Division, OAG's Solicitor General has been placed on notice of the underlying misconduct due to her involvement with D.C. Government's opposition brief and oral arguments.  At oral arguments, numerous attorneys from OAG were present, wherein the allegations of misconduct were openly addressed before the Court.  D.C. Government again failed to deny, refute, or explain said misconduct.

74.     Upon information and belief, considering the gravity of the legal arguments raised in Plaintiffs' appellate brief and the nature of the misconduct alleged to have occurred within OAG, Attorney General Karl Racine knew or should have known of the unconstitutional actions of his Assistant Attorney Generals.  The Attorney General has failed to, or direct his subordinates to, remedy said misconduct.  The Attorney General has also failed to train his subordinates appropriately to avoid further constitutional violations.  The Attorney General has

thus approved of his subordinates' actions and demonstrated a deliberate indifference to the risks presented.

75.     In addition to OAG, Plaintiffs have notified the D.C. Office of the Inspector General, the D.C. Board of Ethics and Government Accountability, the D.C. Office of the Mayor, and MPD of the misconduct discussed above.  These offices have also demonstrated a deliberate indifference to investigate credible and substantiated allegations of misconduct committed by Assistant Attorney Generals.

76.     Plaintiffs have incurred substantial expense and economic losses, and also suffered and will continue to suffer from mental and emotional damages, all of which were actually and proximately caused by the grossly negligent, wanton, reckless, and intentional acts of the Defendants, as described above, for which Plaintiffs deserve to be fairly compensated.

## CAUSES OF ACTION

### COUNT I
(Constitutional and Civil Rights Violations – Under 42 U.S.C. § 1983)

Plaintiffs replead and incorporate by reference herein, each and every allegation set forth above, and further state as follows:

77.     At all relevant times mentioned herein, Plaintiffs Stephen Ollar and Miriam Berman had clearly established rights under the Constitution of the United States, including, but not limited to, the right under the Fourth Amendment to be free from unreasonable seizures, and rights under the Fifth and Fourteenth Amendments to have life, liberty, property, and the sanctity of the family protected by due process of law.

78.     At all relevant times herein, Defendant D.C. Government retained Defendants Chanelle Reddrick, Brooke Beander, Lynsey Nix, and Norrell Atkinson, as agents, servants,

employees, and/or state actors of Defendant D.C. Government, to act on D.C. Government's behalf in their official capacities, as described more specifically above, under color of state law.

79.     At all relevant times herein, Defendant D.C. Government and its agents, servants, employees, and/or state actors, acting under color of state law, owed a continuing duty to reasonably ensure that the clearly-established federal constitutional and civil rights of the Plaintiffs were not violated, to reasonably ensure that the Plaintiffs' rights in this regard were adequately protected, to act responsibly when provided notice that the Plaintiffs' rights were violated, and to adequately supervise and train employees to avoid constitutional violations.

80.     By the activities described above, Defendants Chanelle Reddrick, Brooke Beander, Lynsey Nix, and Norrell Atkinson, individually, and Defendant D.C. Government, acting by and through its actual and/or apparent agents, servants, employees, and/or state actors, including, but not limited to, Defendants Chanelle Reddrick, Brooke Beander, Lynsey Nix, and Norrell Atkinson, acting under color of state law as conferred on them by the District of Columbia and/or the Federal government, violated these duties, by intentionally, maliciously, and/or with reckless disregard depriving Plaintiffs of their federal constitutional rights, privileges, and immunities, including, but not limited to:  freedom from the deprivation of liberty, in violation of the Fourth, Fifth, and Fourteenth Amendments; and freedom from the violation of Plaintiffs' underlying liberty interest in the care, custody, companionship, and management of their child, in violation of the Fifth and Fourteenth Amendments.

81.     The aforementioned acts, omissions, and systemic deficiencies are policies and customs of the Defendant D.C. Government and its agents, servants, employees, and/or state actors, which have improperly been permitted and sanctioned, and as such, have resulted in a pattern and practice of improper conduct, consisting of, *inter alia*:

      a.     Deprivations of due process so routine that, despite actual or constructive knowledge that its agents, servants, employees, and/or state actors violated Plaintiffs' constitutional rights, Defendants engaged in a continuing course of conduct throughout the proceedings to avoid accountability and hinder Plaintiffs' redress;

      b.     Constitutional compliance in the District so nonexistent that Defendants seized Plaintiffs' child without judicial approval or exigency and repeatedly presented false testimony;

      c.     At all relevant times, there was no system in place designed to ensure that innocent parties ensnared in the D.C. Government's child welfare system receive the necessary due process and other constitutional guarantees, to which they are entitled.

82.     Despite the fact that it knew or should have known that this pattern of conduct was being carried out by its agents, servants, employees, and/or state actors, Defendant D.C. Government failed to take adequate and reasonable actions to ensure that the constitutional and civil rights of Plaintiffs and other citizens are not routinely violated.

83.     The acts alleged herein were committed either at the instruction of Defendant D.C. Government, with the knowledge and consent of Defendant D.C. Government, or were thereafter ratified and/or approved by Defendant D.C. Government and its various policymakers.

84.     The acts alleged herein violated clearly established Federal Constitutional rights, criminal statutes, court rules, and attorney rules of professional conduct, were not objectively reasonable, and were done under circumstances in which no reasonable official in the aforementioned positions would fail to realize that his or her conduct was a violation of

Plaintiffs' rights.   Such violations also illustrate the negligent and deliberate indifference manifested by systemic and grossly inadequate instruction, training, supervision, control, discipline, and policies on the part of Defendant D.C. Government.

85.   The foregoing acts, omissions, and systemic deficiencies were authorized, permitted, and tolerated, causing the individual Defendants to be unaware of or disregard the rules and policies governing their activities, with the foreseeable result that the Defendants acted in their respective roles in a manner that was not constitutionally acceptable.

86.   As a direct and proximate result of the acts and omissions of Defendant D.C. Government, and its agents, servants, employees, and/or state actors, including but not limited to Defendants Chanelle Reddrick, Brooke Beander, Lynsey Nix, and Norrell Atkinson, acting in their respective capacities under color of state law, and as a direct and proximate result of the deficiencies of Defendant D.C. Government's policies and customs, Plaintiffs suffered injuries and damages, as set forth more fully above.

WHEREFORE, Plaintiffs Stephen Ollar and Miriam Berman demand judgment of and against Defendant D.C. Government; Defendant Chanelle Reddrick, individually and/or as the agent, servant, and/or employee of the D.C. Government in her capacity with CFSA; Defendant Brooke Beander, individually and/or as the agent, servant, and/or employee of the D.C. Government in her capacity with CFSA; Defendant Lynsey Nix, individually and/or as the agent, servant, and/or employee of the D.C. Government in her capacity as an Assistant Attorney General; and Defendant Norrell Atkinson, individually and/or as the agent, servant, employee, and/or state actor of the D.C. Government; jointly and severally, in the full amount of Five Million Dollars ($5,000,000.00) in compensatory damages, together with pre-judgment and post-judgment interest thereon; and that this Court award Plaintiffs their costs and expenses

30

in this action, as well as statutory attorney's fees pursuant to 42 U.S.C. § 1988, and such other and further relief as the Court deems just and appropriate.

**COUNT II**
(Negligence and Gross Negligence)

Plaintiffs replead and incorporate by reference herein, each and every allegation set forth above, and further state as follows:

87.     In their interactions with Plaintiffs Stephen Ollar and Miriam Berman, and in the course of conducting activities both within and beyond the scope of their assigned work activities, Defendants owed a duty to Plaintiffs to exercise reasonable care, with due regard for the truth, established procedures, and the important and irreversible consequences of their actions, as well as the Plaintiffs' various liberty, property rights, and interests generally.

88.     Through their acts as set forth above, Defendants breached said duty by carelessly, improperly, and negligently performing their assigned duties, mischaracterizing the truth, and facilitating a process that violated the rights and other protected interests of Plaintiffs.

89.     Defendants were careless, negligent, and grossly deviated from the applicable standard of due care, and otherwise breached their duties owed to Plaintiffs, in that they, among other things:

a.     Made various knowingly false statements and critical omissions concerning Plaintiffs Stephen Ollar and Miriam Berman and their activities, and specifically made repeated and lingering false accusations and insinuations that Plaintiffs had abused and/or neglected their daughter, even after it became, or should have become, readily apparent to any reasonably objective observer that they had not;

b.      Repeatedly mischaracterized the facts during their inquiries, investigations, neglect proceedings, and appeal against Plaintiffs, without reasonably conducting a complete review of pertinent case files, documents, witness statements, and other available evidence;

c.      Repeatedly destroyed, withheld, and redacted documents and communications that were requested and subpoenaed during discovery, and were requested pursuant to the District's FOIA legislation, without just cause and in violation of various statutes and rules of procedure;

d.      Deprived Plaintiffs' exercise of their civil, statutory, and constitutional rights; and otherwise showed a reckless disregard for Plaintiffs' attempts to exercise such legal rights and privileges to which they were entitled;

e.      Unduly delayed various official decisions and acts, in violation of established deadlines, thereby unfairly extending the deprivation of Plaintiffs' rights, and increasing Plaintiffs' various costs, expenses, and damages;

f.      Wrongfully impugned the reputations of the Plaintiffs, private citizens, in willful and reckless disregard of the truth;

g.      Wrongfully deprived Plaintiffs of the care and custody of their daughter, without first establishing honest probable cause to justify this severe deprivation;

h.      Failing to protect Plaintiffs and their daughter from the abuses of medical professionals, even after having been placed on notice that such abuses were ongoing;

i.      Unduly prolonged a deprivation through Defendants' failure to reasonably and actively perform, advance, and/or complete their investigations, safety

planning, family meetings, neglect proceedings, discovery obligations, reunification efforts, and other activities in a timely manner;

      j.    Recklessly pursued abuse and neglect proceedings against Plaintiffs into appeal, even after being placed on notice that the original probable cause determination was obtained through fraud, deceit, and perjury, and without any supporting witnesses or medical records;

      k.    Failing to conduct their activities in accordance with applicable statutes, regulations, standard operating procedures, court rules, and rules of professional conduct;

      l.    Fabricating claims of additional injuries to Plaintiffs' daughter despite an absence of any symptomology and the bulk of opposing medical opinions of highly qualified medical professionals;

      m.    Failing to obtain judicial approval for the premeditated removal of Plaintiffs' six-week old breastfeeding infant;

      n.    Participating in a wrongful conspiracy; and

      o.    Failing to consider that their actions might be wrong, refusing to fairly and promptly reconsider decisions, and declining to admit previous mistakes.

90.    As a direct and proximate result of Defendants' negligence, carelessness, and gross breach of due care, Plaintiffs have suffered substantial financial losses, as well as lost wages and diminution of earning capacity; and have suffered and will continue to suffer from mental and emotional injuries, all of which are permanent in nature, for which compensation is warranted.

WHEREFORE, Plaintiffs Stephen Ollar and Miriam Berman demand judgment of and against Defendant D.C. Government; Defendant Chanelle Reddrick, individually and/or as the agent, servant, and/or employee of the D.C. Government in her capacity with CFSA; Defendant Brooke Beander, individually and/or as the agent, servant, and/or employee of the D.C. Government in her capacity with CFSA; Defendant Lynsey Nix, individually and/or as the agent, servant, and/or employee of the D.C. Government in her capacity as an Assistant Attorney General; and Defendant Norrell Atkinson, individually and/or as the agent, servant, employee, and/or state actor of the D.C. Government; jointly and severally, in the full amount of Five Million Dollars ($5,000,000.00) in compensatory damages, together with pre-judgment and post-judgment interest thereon; and that the Court award Plaintiffs their costs and expenses in this action, as well as such other and further relief as the Court deems just and appropriate.

## COUNT III
### (Abuse of Process)

Plaintiffs replead and incorporate by reference herein, each and every allegation set forth above, and further state as follows:

91.    At all relevant times mentioned herein, Defendants owed a duty to Plaintiffs Stephen Ollar and Miriam Berman not to abuse the D.C. Government's investigatory, civil neglect, and administrative processes in a manner to deprive Plaintiffs of the rights to which they were entitled under law.

92.    Defendant D.C. Government, and Defendants Chanelle Reddrick, Brooke Beander, Lynsey Nix, and Norrell Atkinson, as agents, servants, employees, and/or state actors of Defendant D.C. Government, acting through their respective capacities as set forth more fully above, breached this duty to Plaintiffs, *inter alia*:

a.      by conducting improper, incomplete, and unnecessarily delayed inquiries and investigations;

b.      by failing to hold a timely Family Team meeting or Safety Plan meeting with Plaintiffs prior to removing D.O. from their care;

c.      by failing to seek judicial approval for the premeditated removal of Plaintiffs' six-week old breastfeeding infant;

d.      by failing to timely adhere to various deadlines, time requirements, and rules put in place so that any systemic damage caused by the temporary separation of parents from their children and the stress and anxiety of litigation might be minimized rather than unduly exacerbated;

e.      by drafting and filing a Petition with the Family Court, containing knowingly false representations of fact and lacking a genuine legal basis for the unlawful removal of Plaintiffs' daughter;

f.      by making knowingly false representations, critical omissions, suborning perjured testimony, and offering perjured testimony at the probable cause hearing;

g.      by proceeding with the same Petition into the litigation process without completing its investigations or finding a single medical expert who could support the D.C. Government's stated position that D.O.'s injuries were "not medically possible";

h.      by destroying, withholding, and redacting documents and communications that were requested during discovery and subpoenaed, without just cause and in violation of various statutes, regulations, and rules of procedure;

i.      by forcing Plaintiffs to bear all of the anxiety and costs of defending an action that Defendants knew they lacked evidence to support.

93.     As a direct and proximate result of the aforementioned conduct and the actual and repeated abuses of process by Defendants and their agents, servants and/or employees, Plaintiffs suffered substantial economic damages, including expenses, lost wages, and diminished earning capacity, and will continue to suffer, *inter alia*, severe emotional distress, mental anguish, embarrassment, and humiliation, all of which are permanent in nature.

WHEREFORE, Plaintiffs Stephen Ollar and Miriam Berman demand judgment of and against Defendant D.C. Government; Defendant Chanelle Reddrick, individually and/or as the agent, servant, and/or employee of the D.C. Government in her capacity with CFSA; Defendant Brooke Beander, individually and/or as the agent, servant, and/or employee of the D.C. Government in her capacity with CFSA; Defendant Lynsey Nix, individually and/or as the agent, servant, and/or employee of the D.C. Government in her capacity as an Assistant Attorney General; and Defendant Norrell Atkinson, individually and/or as the agent, servant, employee, and/or state actor of the D.C. Government; jointly and severally, in the full amount of Five Million Dollars ($5,000,000.00) in compensatory damages, together with pre-judgment and post-judgment interest thereon; and that the Court award Plaintiffs their costs and expenses in this action, as well as such other and further relief as the Court deems just and appropriate.

### COUNT IV
(Intentional Infliction of Emotional Distress)

Plaintiffs replead and incorporate by reference herein, each and every allegation set forth above, and further state as follows:

94.     At all relevant times mentioned herein, Defendant D.C. Government, acting by and through its agents, servants, employees, and/or state actors, *inter alia*, Defendant Chanelle Reddrick, individually and/or as the agent, servant, and/or employee of the D.C. Government in

her capacity with CFSA; Defendant Brooke Beander, individually and/or as the agent, servant, and/or employee of the D.C. Government in her capacity with CFSA; Defendant Lynsey Nix, individually and/or as the agent, servant, and/or employee of the D.C. Government in her capacity as an Assistant Attorney General; and Defendant Norrell Atkinson, individually and/or as the agent, servant, employee, and/or state actor of the D.C. Government; did by extreme, outrageous, intentional, willful, malicious, and/or reckless conduct intentionally humiliate, embarrass, shock, scar, and frighten Plaintiffs, as set forth above.   Plaintiffs also seek compensation from Defendants Chanelle Reddrick, Brooke Beander, Lynsey Nix, and Norrell Atkinson, individually, for any and all acts stated above that are deemed outside of their respective official capacities and exceed the scope of their respective authorities.

95.     As a direct and proximate result of the aforementioned extreme, outrageous, intentional, willful, malicious and reckless conduct of Defendants and their agents, servants, employees and/or state actors, Plaintiffs suffered, and will continue to suffer, *inter alia*, severe emotional distress, mental anguish, embarrassment, and humiliation, all of which are permanent in nature.

WHEREFORE, Plaintiffs Stephen Ollar and Miriam Berman demand judgment of and against Defendant D.C. Government; Defendant Chanelle Reddrick, individually and/or as the agent, servant, and/or employee of the D.C. Government in her capacity with CFSA; Defendant Brooke Beander, individually and/or as the agent, servant, and/or employee of the D.C. Government in her capacity with CFSA; Defendant Lynsey Nix, individually and/or as the agent, servant, and/or employee of the D.C. Government in her capacity as an Assistant Attorney General; and Defendant Norrell Atkinson, individually and/or as the agent, servant, employee, and/or state actor of the D.C. Government; jointly and severally, in the full amount

37

of Five Million Dollars ($5,000,000.00) in compensatory damages, together with pre-judgment and post-judgment interest thereon; and that the Court award Plaintiffs their costs and expenses in this action, as well as such other and further relief as the Court deems just and appropriate.

### COUNT V
(Negligent Infliction of Emotional Distress)

Plaintiffs replead and incorporate by reference herein, each and every allegation set forth above, and further state as follows:

96.     At all relevant times mentioned herein, Defendants owed a duty of due care to conduct themselves reasonably in a manner so as not to humiliate, embarrass, shock, scar, or frighten Plaintiffs, and to avoid any unreasonable or unnecessary infliction of emotional distress upon the Plaintiffs, as set forth above.

97.     At all relevant times mentioned herein, Defendant D.C. Government, acting by and through its agents, servants, employees, and/or state actors, *inter alia*, Defendant Chanelle Reddrick, individually and/or as the agent, servant, and/or employee of the D.C. Government in her capacity with CFSA; Defendant Brooke Beander, individually and/or as the agent, servant, and/or employee of the D.C. Government in her capacity with CFSA; Defendant Lynsey Nix, individually and/or as the agent, servant, and/or employee of the D.C. Government in her capacity as an Assistant Attorney General; and Defendant Norrell Atkinson, individually and/or as the agent, servant, employee, and/or state actor of the D.C. Government; did breach said duty, as set forth above.

98.     As a direct and proximate result of the aforementioned acts and omissions by Defendants and their agents, servants, employees, and/or state actors Plaintiffs suffered, and will continue to suffer, *inter alia*, severe emotional distress, mental anguish, embarrassment, and humiliation, all of which are permanent in nature.

WHEREFORE, Plaintiffs Stephen Ollar and Miriam Berman demand judgment of and against Defendant D.C. Government; Defendant Chanelle Reddrick, individually and/or as the agent, servant, and/or employee of the D.C. Government in her capacity with CFSA; Defendant Brooke Beander, individually and/or as the agent, servant, and/or employee of the D.C. Government in her capacity with CFSA; Defendant Lynsey Nix, individually and/or as the agent, servant, and/or employee of the D.C. Government in her capacity as an Assistant Attorney General; and Defendant Norrell Atkinson, individually and/or as the agent, servant, employee, and/or state actor of the D.C. Government; jointly and severally, in the full amount of Five Million Dollars ($5,000,000.00) in compensatory damages, together with pre-judgment and post-judgment interest thereon; and that the Court award Plaintiffs their costs and expenses in this action, as well as such other and further relief as the Court deems just and appropriate.

## COUNT VI
(Negligent Hiring, Training, Supervision, and Retention)

Plaintiffs replead and incorporate by reference herein, each and every allegation set forth above, and further state as follows:

99.     At all relevant times mentioned herein, Defendant D.C. Government, acting by and through the agents, servants, and/or employees of CFSA and OAG, had a continuing duty to reasonably, carefully, and conscientiously secure the services of qualified and well-trained employees, agents, and/or servants, and to reasonably hire, train, supervise, and retain their employees, agents and/or servants so as to reasonably assure, *inter alia*, that they were trained in reasonable methods of investigation; that they would not remove babies from their natural parents without just cause; that they would appropriately refrain from seeking to place unreasonable restrictions on parents' access to their own children or unreasonably delay the return of such children when the return is warranted; that they would recognize that the proper

role of the D.C. Government and its counsel is to represent the best interests of children; that they would not engage in unprofessional and/or criminal conduct; that they would seek judicial approval for premeditated removals; that they would respect the rights of citizens; that they would refrain from retaliations based on challenges to official conduct or personal dislikes; and generally that they would at all times act with a sufficient minimum level of professionalism, as required by the duties of their respective office.

100.   At all relevant times mentioned herein, Defendant D.C. Government, acting by and through their agents, servants and/or employees, breached their duties owed to Plaintiffs. The violations illustrate deliberate indifference manifested by systemic and grossly inadequate instruction, training, and lack of adequate supervision, control, discipline, and/or policies on the part of Defendant D.C. Government and its agencies, as well as the other named Defendants.

101.   As a direct and proximate result of the aforesaid negligent hiring, training, supervision, and retention, Plaintiffs suffered substantial economic damages, including expenses, lost wages, and diminished earning capacity, and will continue to suffer, *inter alia*, severe emotional distress, mental anguish, embarrassment, and humiliation, all of which are permanent in nature.

WHEREFORE, Plaintiffs Stephen Ollar and Miriam Berman demand judgment against Defendant D.C. Government in the full amount of Five Million Dollars ($5,000,000.00) in compensatory damages, together with pre-judgment and post-judgment interest thereon; and that this Court award Plaintiffs their costs and expenses in this action, as well as such other and further relief as the Court deems just and appropriate.

### COUNT VII
(Punitive Damages)

Plaintiffs replead and incorporate by reference herein, each and every allegation set forth above, and further state as follows:

102.     Defendants Chanelle Reddick, Brooke Beander, Lynsey Nix, and Norrell Atkinson, acting individually and as agents, servants, employees, and/or state actors of Defendant D.C. Government in their respective official capacities, as described more fully above, acted with actual malice toward Plaintiffs by engaging in conscious and deliberate wrongdoing with an evil or wrongful motive, with an intent to injure, with ill will, and with a callous indifference to the federally protected rights of Plaintiffs.

WHEREFORE, Plaintiffs demand judgment of and against Defendant Chanelle Reddick, individually and/or as the agent, servant, and/or employee of the D.C. Government in her capacity with CFSA; Defendant Brooke Beander, individually and/or as the agent, servant, and/or employee of the D.C. Government in her capacity with CFSA; Defendant Lynsey Nix, individually and/or as the agent, servant, and/or employee of the D.C. Government in her capacity as an Assistant Attorney General; and Defendant Norrell Atkinson, individually and/or as the agent, servant, employee, and/or state actor of the D.C. Government; jointly and severally, in the full amount of Five Million Dollars ($5,000,000.00) in punitive damages, plus pre-judgment and post-judgment interest and costs as warranted.

## JURY DEMAND

Plaintiffs hereby request a trial by jury as to all issues triable herein.

Respectfully submitted,


_____
Miriam Berman
3600 Connecticut Ave., N.W., Apt. 307
Washington, DC 20008
Tel:  (703) 282-8384
mimsberman@yahoo.com
*Pro se Plaintiff*


_____
Stephen P. Ollar
D.C. Bar No.:  1617446
3600 Connecticut Ave., N.W., Apt. 307
Washington, DC 20008
Tel:  (907) 382-7675
stephenpollar@gmail.com
*Pro se Plaintiff*